UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| CAROL BOYKINS, | Case No. 18-13931 |
| Plaintiff, | |
| | SENIOR U.S. DISTRICT JUDGE |
| v. | ARTHUR J. TARNOW |
| TRINITY, INC., ET AL., | U.S. MAGISTRATE JUDGE |
| | ELIZABETH A. STAFFORD |
| Defendants. | |

**ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS [52, 53]**

This case arises from the 2018 death of Carl Johnson, Jr., a twenty-year-old, autistic student with a history of seizures. (Am. Compl. ¶ 21). On July 10, 2018, Johnson suffered a seizure while aboard a school bus operated by Defendant Trinity Transportation ("Trinity"), a contractor of Defendant Detroit Public Schools Community District ("DPSCD"). (*Id*. ¶¶ 28, 35, 37). Johnson died at the hospital later that day. (*Id*. ¶¶ 54-55). Plaintiff, Carol Boykins, is Johnson's grandmother and the Personal Representative of his estate. (*Id*. ¶¶ 1-2). She brings claims against DPSCD, Trinity, Trinity employee Shirley MacAlpine, and DPSCD employees Jonque Russell, Darline Brooks, Mary Burns, and Melinda Lawery.

DPSCD and Trinity have each moved to dismiss Count IV of Plaintiff's Amended Complaint [48], a claim under 42 U.S.C. § 1983. (ECF No. 52; ECF No. 53). In Count IV, Plaintiff asserts that DPSCD and Trinity, through their respective

1

employees, denied Johnson "equal access to publicly run educational programs" in violation of the Fourteenth Amendment and several federal and state statutes. (Am. Compl. ¶ 91). For the reasons articulated below, Defendants' Motions [52, 53] will be **DENIED**.

## FACTUAL BACKGROUND

### I. The Incident

At approximately 7:00 A.M. on July 10, 2018, a Trinity-owned school bus arrived at Johnson's home to transport him to the Jerry L. White Center ("the Center"), a DPSCD-operated school for students with special needs. (*Id.* ¶¶ 22, 32-33). Johnson had an Individual Educational Program ("IEP")[1] and had received special education services at the Center for several years. (*Id.* ¶ 23). The bus in question was an ordinary school bus, as opposed to a specific special-needs bus. (*Id.* ¶ 36). Behind its wheel was Shirley MacAlpine, a Trinity employee. (*Id.* ¶¶ 6, 32). Also on board was Darline Brooks, a DPSCD employee. (*Id.* ¶¶ 8, 34). The drive from Johnson's home to the Center lasted just over forty-five minutes. (*Id.* ¶ 36).

---

[1] "An individualized education program (IEP) is a written document for students with disabilities ages 3 through 25 that outlines the student's educational needs and goals and any programs and services the intermediate school district (ISD) and/or its member district will provide to help the student make educational progress." *Individualized Education Programs (IEPs)*, MICH. DEP'T EDUC., https://www.michigan.gov/mde/0,4615,7-140-6598_88186_88204---,00.html [https://perma.cc/A535-27R9] (last visited Dec. 10, 2020). According to DPSCD, "[t]ransportation services are provided for students according to the recommendations on their Individualized Education Program (IEP)." *Placement/Compliance Center*, DETROIT PUB. SCHS. CMTY. DIST., https://www.detroitk12.org/Page/7372 [https://perma.cc/ES3V-DCJE] (last visited Dec. 10, 2020).

2

Johnson sat in the fourth row, out of the line of sight of Brooks, who sat towards the front of the bus. (*Id.* ¶¶ 34, 43).

When the bus arrived at the Center, Johnson, who was in normal health, attempted to disembark but was not permitted. (*Id.* ¶¶ 40-41). Instead, he and another student were made to wait on the bus pursuant to a DPSCD "policy" requiring special-needs students to remain on board until DPSCD was "ready to receive" them. (*Id.* ¶ 40). The bus was hot and poorly ventilated, and sometime after Johnson was denied permission to disembark, he suffered a seizure. (*Id.* ¶¶ 36, 42). Johnson lost control of his body movements and fell face down across the bus seats in a prone position, compromising his airway. (*Id.* ¶¶ 43, 45). When MacAlpine observed Johnson in distress, she said to Brooks, "He is just having a seizure, let him do what he does." (*Id.* ¶ 46). Brooks replied, "I don't know anything about seizures." (*Id.* ¶ 47). Though MacAlpine, Brooks, and Russell[2] all approached Johnson, none made any attempt to reposition him or clear his airway. (*Id.* ¶ 45). MacAlpine did attempt to contact Trinity's dispatch operators and secure medical attention for Johnson, however, dispatch did not immediately respond. (*Id.* ¶¶ 49-50).

Eventually, Defendant Mary Burns, a DPSCD nurse, was summoned from inside the school. (*Id.* ¶ 52). Emergency Medical Services ("EMS") arrived about

---

[2] It is not clear whether Russell, another DPSCD employee, was aboard the bus when it picked Johnson up from his home or boarded after it arrived at the Center.

3

twelve minutes later. (*Id.* ¶ 53). Prior to the arrival of EMS, Burns failed to give Johnson chest compressions or use an automatic electronic defibrillator ("AED"). (*Id.* ¶ 52-53). She did call for someone to bring her an AED after about ten minutes—around the time she began trying to summon another nurse, Defendant Melinda Lawery, for help—however, neither the AED nor Lawery came. (*Id.* ¶ 52). Instead, Burns spent most of the intervening period making calls on her cell phone and consulting her clipboard. (*Id.*). By the time EMS got Johnson to the hospital, he had suffered irreversible brain swelling and severe anoxic brain injury. (*Id.* ¶ 54). He died later that day. (*Id.* ¶ 55).

## II. The DPSCD-Trinity Contract

In July 2015, DPSCD and Trinity entered into a contract governing the period running from July 23, 2015, through August 31, 2018. (ECF No. 53-1). Pursuant to that contract, Trinity was responsible for providing transportation to DPSCD students, including students with special needs. (*Id.* at 1624). The contract made "[t]he Executive Director of the Office of Transportation . . . responsible for the day-to-day operation of [the] Contract, and for monitoring the performance of [Trinity]." (*Id.*). Accordingly, DPSCD was responsible for creating the bus schedule, determining routes, setting driver and vehicle requirements, sanctioning Trinity for enumerated prohibited conduct, and establishing accident protocols, among other things. (*Id.* at 1624-30). Trinity was responsible for hiring and training its

4

employees, keeping its busses maintained according to requirements set by DPSCD, setting various non-accident emergency protocols, reporting student misconduct, and maintaining the insurance required by DPSCD and applicable law. (*Id.*). The contract designated Trinity an independent contractor. (*Id.* at 1641).

## PROCEDURAL BACKGROUND

Plaintiff initially filed suit in state court on October 8, 2018. (ECF No. 1, PageID.35). Defendants removed the case to federal court on December 12, 2018. (*Id.* at 3). On October 14, 2019, Defendants moved for judgment on the pleadings. (ECF No. 23; ECF No. 24). On December 13, 2019, after learning that Plaintiff intended to amend her Complaint, Defendants moved to stay the case. (ECF No. 31). On January 29, 2020, the Court agreed to stay the dispositive motion deadline until May 18, 2020, but instructed that discovery proceed. (ECF No. 37, PageID.1102-03). Plaintiff requested leave to amend on May 27, 2020. (ECF No. 42). On June 30, 2020, the Court granted Plaintiff's Motion [42], denied as moot Defendants' Motions for Judgment on the Pleadings [23, 24], and lifted the stay. (ECF No. 47). Plaintiff filed her Amended Complaint on July 6, 2020. (ECF No. 48). DPSCD and Trinity moved to dismiss on July 23, 2020. (ECF No. 52; ECF No. 53). The Court held a hearing on January 5, 2021. (ECF No. 102).

## STANDARD OF REVIEW

A motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) seeks to dismiss a complaint for failure to state a claim. To survive such a motion, the plaintiff "must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.*, 615 F.3d 622, 627 (6th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). "Detailed factual allegations" are not strictly necessary, "but the complaint must contain more than conclusions and an unsubstantiated recitation of the necessary elements of a claim." *McCormick v. Miami Univ.*, 693 F.3d 654, 658 (6th Cir. 2012). The Court "assume[s] the veracity of well-pleaded factual allegations and determine[s] whether the plaintiff is entitled to legal relief as a matter of law." *Id.* (citing *Ashcroft*, 556 U.S. at 679).

## ANALYSIS

The instant Motions [52, 53] attack Count IV of the Amended Complaint, which argues that DPSCD and Trinity are liable under § 1983 for DPSD's alleged "policy of denying . . . special needs individual[s] . . . equal access to publicly run educational programs." (Am. Compl. ¶ 91). To state a claim, Plaintiff must plausibly allege "(1) that a violation of a federal right took place, (2) that the defendants acted

under color of state law, and (3) that a municipality's policy or custom caused that violation to happen." *Bright v. Gallia Cty.*, 753 F.3d 639, 660 (6th Cir. 2014) (citing *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008)). DPSCD challenges Plaintiff on the third prong, while Trinity challenges Plaintiff on the second.

I. **DPSCD's Motion to Dismiss [52]**

DPSCD's Motion [52] argues that Plaintiff has failed to allege facts sufficient to support a municipal policy or custom under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). (ECF No. 52, PageID.1583). In *Monell*, the Supreme Court clarified that while § 1983 is an acceptable vehicle for claims against local government entities, plaintiffs seeking municipal liability are required to do more than merely allege a theory of *respondeat superior*. *Id.* at 691. Rather, where a plaintiff brings a claim against a local government entity, such as a school district, they must "establish that an officially executed policy, or the toleration of a custom within the school district [led] to, cause[d], or result[ed] in the [alleged] deprivation." *Doe v. Claiborne Cty.*, 103 F.3d 495, 507 (6th Cir. 1996); *see Polk Cty. v. Dodson*, 454 U.S. 312, 326 (1981) (explaining that it "must be 'the moving force of the constitutional violation'" (quoting *Monell*, 436 U.S. at 694)).

> A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

7

*Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

Plaintiff's Amended Complaint alleges that at the time of the incident, DPSCD had adopted policies pursuant to which: 1) critical IEP information was not shared with employees responsible for student transportation; 2) students with special needs were prohibited from disembarking school busses without permission; 3) students with special needs were denied medical attention while waiting to be permitted to disembark; 4) students with special needs were not properly monitored during transport; and 5) students with special needs were not provided with a specific transportation vehicle conforming with their individual needs. (Am. Compl. ¶ 91). Plaintiff also alleges that, at the time of the incident, DPSCD had failed to institute policies requiring: 1) teachers of students with special needs to meet them upon arrival so that they could disembark immediately, or 2) practice pick-ups and drop-offs of special-needs students or the development of a detailed bus schedule for special-needs students. (*Id.*). Finally, Plaintiff alleges that DPSCD failed to train its employees and agents responsible for student transportation in CPR, first aide, or seizure care. (*Id.*).

### a. *Official Policy Theory*

Although Plaintiff uses the word "policy" several times in her Amended Complaint, only two of her allegations resemble a "fixed plan[] of action"

appropriate for analysis as a municipal policy (in contrast to a failure to train or a custom of indifference). *Jackson v. City of Cleveland*, 925 F.3d 793, 829 (6th Cir. 2019) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986)); *see also D'Ambrosio v. Marino*, 747 F.3d 378, 387 (6th Cir. 2014) (analyzing policy allegation under inaction theory despite complaint's use of the word "policy"). These are the allegations that 1) DPSCD "denie[s] access to an open school upon arrival and require[s] . . . children [with special needs] to wait and remain on [their] school bus" until "DPSCD [is] ready to receive [them]," and that 2) DPSCD transports special-needs students in standard school busses rather than in accordance with their specific needs. (Am. Compl. ¶¶ 40, 91). Plaintiff elaborates in her Response [64] that "special needs students, regardless of their IEP, [would] remain on [an ordinary] school bus for an indefinite period of time until [their respective teacher,] 'an adult'[,] was present to escort [them] off the bus and take them to class." (ECF No. 64, PageID.1922, 1933).

In her Amended Complaint, Plaintiff alleges that Johnson and another special-needs student were confined to their bus after its arrival at the Center on July 10, 2018. (Am. Compl. ¶ 40). Additionally, the DPSCD-Trinity contract states that no student may be "discharged from the bus before their designated [start] time unless authorized by the principal of the school or the Director of the Office of Transportation," and that "Special Education students . . . shall be provided with

curb-to-curb service *as determined by [DPSCD]*." (ECF No. 53-1, PageID.1628-29) (emphasis added). Based on the above, the Court finds it plausible that there are official policies requiring that special-needs students be transported to the Center in busses that do not conform with their individual needs and remain on board until a teacher can escort them to class. Accordingly, Plaintiff's *Monell* claim may proceed under an official policy theory.

### b. Failure to Train Theory

To prevail under a failure to train theory, a plaintiff must be able to prove that: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 286-87 (6th Cir. 2020) (quoting *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)). Here, DPSCD argues that Plaintiff has not alleged any facts supporting "deliberate indifference" because Plaintiff has only cited facts relating to the date of the incident. (ECF No. 52, PageID.1589). Plaintiff responds that her allegation that DPSCD "[m]aintain[ed] a policy of failing to properly train, and/or hire its employees, agents, bus aides, and bus drivers [in] CPR, First Aide and/or Seizure Care despite restraining its students on a bus for an undetermined period of and essentially denying its student access to necessary emergent care" is sufficient. (ECF No. 64, PageID.1933). Plaintiff

10

emphasizes that she is actually challenging DPSCD's "policy of not training any of its agents and/or employees," however, this conflates the two theories of liability. (*Id.* at 1934).

The Sixth Circuit has repeatedly held in the summary judgment context that an isolated incident is insufficient to establish deliberate indifference. *See, e.g.*, *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 912 (6th Cir. 1995) ("Without notice that students suffering from seizures on school buses were harmed by school bus drivers' lack of 'seizure management training,' the Board's failure to conduct such a training program cannot rise to the level of deliberate indifference." (citing *Patzner v. Burkett*, 779 F.2d 1363, 1367 (8th Cir. 1985))); *Thomas*, 398 F.3d at 433. And at least one unpublished decision has stated that the same standard applies to motions to dismiss. *See Arsan v. Keller*, 784 F. App'x 900, 916 (6th Cir. 2019) (explaining that "in order to state a failure-to-train claim . . . , [a plaintiff] must allege 'prior instances of unconstitutional conduct demonstrating that the municipality had ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" (quoting *Burgess*, 735 F.3d at 478)).

The only exception to this rule is a "single-incident liability" claim. *See City of Canton v. Harris*, 489 U.S. 378, 390 (1989) ("[I]t may happen that in light of the duties assigned to specific . . . employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional

rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."). Here, however, Plaintiff does not proffer a theory of single-incident liability and fails to allege any prior incidents of misconduct. Accordingly, she cannot proceed under a failure-to-train theory.

### c. *A Custom of Tolerance or Acquiescence of Federal Rights Violations (i.e. "Inaction" Theory)*

The remainder of Plaintiff's allegations will survive only if they plausibly allege a custom of tolerance or acquiescence of federal rights violations, sometimes referred to as an "inaction theory." *See D'Ambrosio*, 747 F.3d at 387.

> Where a municipal-liability claim is premised on an 'inaction theory,' the plaintiff must prove (1) the existence of a clear and persistent pattern of violating federal rights . . . ; (2) notice or constructive notice on the part of defendants; (3) the defendants' tacit approval of the unconstitutional conduct, such that their deliberate indifference in failing to act can be said to amount to an official policy of inaction; and (4) that the defendants' custom was the 'moving force,' or direct causal link for the constitutional deprivation.

*Powers v. Hamilton County Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007) (quoting *Doe*, 103 F.3d at 508). The Sixth Circuit has found that a complaint which fails to allege factual allegations of prior incidents of misconduct cannot state a claim under an inaction theory. *See Bickerstaff v. Lucarelli*, 830 F.3d 388, 402 (6th Cir. 2016) ("With no factual allegations showing a formal policy or any prior incidents to support the [defendant's] adoption of such an informal practice or custom, [the plaintiff's] *Monell* municipal-liability claim accordingly fails."). Here, like in

*Bickerstaff*, Plaintiff offers no prior incidents of misconduct to support an inference of inaction with respect to any of her claims. Accordingly, she cannot proceed under an inaction theory.[3]

## II. Trinity's Motion to Dismiss [53]

Trinity argues that because it is not a state actor, its conduct cannot give rise to liability under 42 U.S.C. § 1983. (ECF No. 53, PageID.1601). Trinity is correct that § 1983 requires state action, however, private entities may be deemed to be acting under color of state law when their conduct is "fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). Against the backdrop of *Twombly* and *Iqbal*, "simply alleging in a complaint that the [defendant] is a state actor . . . is no longer, if it ever was, sufficient to survive a motion to dismiss." *Marie v. Am. Red Cross*, 771 F.3d 344, 362 (6th Cir. 2014).

The Sixth Circuit "has recognized as many as four tests to aid courts in determining whether challenged conduct is fairly attributable to the State: (1) the public function test; (2) the state compulsion test; (3) the symbiotic relationship or nexus test; and (4) the entwinement test." *Id.* (citing *Vistein v. Am. Registry of*

---

[3] Prior to plausibility pleading, the Sixth Circuit wondered in the *Monell* context "how [a plaintiff] would necessarily know, at the point of [their] complaint, and without the benefit of discovery, whether such a custom or policy might exist, and if it does exist, what its contours might be or how exactly it effected a violation of his constitutional rights." *Petty v. Cty. of Franklin*, 478 F.3d 341, 348 (6th Cir. 2007). This concern remains valid. Unfortunately, the Court is bound by the strict pleading standards outlined above, burdensome though they may be. *See Bailey v. City of Ann Arbor*, 860 F.3d 382, 388 (6th Cir. 2017).

*Radiologic Technologists*, 342 F. App'x 113, 127 (6th Cir. 2009)). Ultimately, however, these tests "all . . . boil down to a core question:[4] whether 'there is such a "close nexus between the State and the challenged action" that seemingly private behavior "may be fairly treated as that of the State itself."'" *Brent v. Wayne Cty. Dep't of Human Servs.*, 901 F.3d 656, 676 (6th Cir. 2018) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)). Here, for the reasons articulated below, the Court answers that question in that affirmative. *See Brentwood Acad.*, 531 U.S. at 295 ("What is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity.").

As an initial matter, Trinity is correct that Plaintiff does not plausibly allege state action under a public function theory. *See Blum v. Yaretsky*, 457 U.S. 991, 1011 (1982) (explaining that private conduct can be attributed to the state if the private actor "perform[s] a function that has been 'traditionally the exclusive prerogative of the State'" (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353 (1974))). "Only functions like holding elections, exercising eminent domain, and operating a company-owned town" are sufficient to make out a public function claim. *Chapman*

---

[4] Because this "core question" is virtually identical to the long-time formulation of the symbiotic relationship/nexus standard, *see Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992), there remains doctrinal confusion as to whether nexus should be treated as an umbrella inquiry or an independent test. *Compare, e.g.*, *Weser v. Goodson*, 965 F.3d 507, 516 (6th Cir. 2020) (describing nexus as one of several "tests"), *with, e.g.*, *Siefert v. Hamilton Cty.*, 951 F.3d 753, 759-60 (6th Cir. 2020) ("Courts have highlighted several 'tests,' but it all comes down to [the nexus standard as explained in *Brent*]."). For the purpose of this analysis, the Court considers nexus in both capacities.

14

*v. Higbee Co.*, 319 F.3d 825, 833-34 (6th Cir. 2003) (citations omitted). And in the context of a motion to dismiss, "the burden is on the [plaintiff] to advance historical and factual allegations in their complaint giving rise a reasonable inference that [the alleged action] is traditionally exclusively in the province of the State." *Marie*, 771 F.3d at 362. Here, Plaintiff has failed to do that.[5]

Trinity is also correct that Plaintiff cannot make out state action by citing laws regulating student transportation and requiring it be made available to special-needs students. *See* MICH. COMP. LAWS §§ 257.1801-77, 380.1756. Although it is true that under a state compulsion theory, private conduct may attributed to the state where the state has "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice" is effectively a state action, *Blum*, 457 U.S. at 1004, the Amended Complaint does not allege that Johnson received transportation pursuant to a statutory mandate. *See Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992). Moreover, the statutes cited by Plaintiff only create a regulatory framework and neither encourage nor condone the conduct of which Plaintiff complains. *See* MICH. COMP. LAWS § 380.1756. Because the compulsion

---

[5] Although the Court finds Plaintiff's pleading insufficient with respect to the public function theory, it notes that Trinity's heavy reliance on *Santiago v. Puerto Rico*, 655 F.3d 61, 69 (1st Cir. 2011), and *Black v. Ind. Area Sch. Dist.*, 985 F.2d 707 (3d Cir. 1993), is misplaced. Both of those cases relied upon *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982) (holding that a private school was not a state actor), to find that private school bus companies do not perform a traditionally exclusive public function. The "traditionally exclusive" analysis is state-specific, however, so decisions involving jurisdictions outside of Michigan have only limited relevance to this inquiry.

analysis looks to the *specific* rights-depriving conduct at issue, *see Wolotsky*, 960 F.2d at 1335, the question of whether DPSCD delegated its statutory transportation mandate to Trinity is not relevant to whether the specific violations complained of by Plaintiff were compelled by the state.

Under the final two "tests," private conduct may be attributed to the state 1) where "there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself," *Wolotsky*, 960 F.2d at 1335, or 2) where the "nominally private character of the [private entity] is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings, and there is no substantial reason to claim unfairness in applying constitutional standards to it." *Brentwood Acad.*, 531 U.S. at 298. The first of these is typically called the symbiotic relationship or nexus test, while the latter is known as the entwinement test. Courts sometimes conflate these standards, as the parties appear to have done here. *See, e.g.*, *S.H.A.R.K. v. Metro Parks Serving Summit Cty.*, 499 F.3d 553, 565 (6th Cir. 2007).

As evidence of Trinity's nexus/entwinement with DPSCD, Plaintiff alleges that DPSCD controlled Trinity's pick up and drop off times and routes; hired, trained, and provided school bus aides for use on Trinity vehicles; controlled the type of vehicles Trinity used; controlled the sharing of IEP information; and

developed Trinity's hiring criteria for bus drivers. (Am. Compl. ¶ 88). Trinity argues that these allegations relate only to the terms of its contract with DPSCD and that they accordingly are an insufficient basis to find nexus/entwinement. (ECF No. 53, PageID.1609-11).

Trinity's argument relies heavily on *In re M.S.*, an unpublished Sixth Circuit decision that found no plausible nexus/entwinement between a school bus company and school district after a bus accident killed and injured several students. 756 F. App'x 510 (6th Cir. 2018). There, the panel noted that "work[ing] together to make certain decisions, such as establishing bus schedules and routes, . . . is not enough" to create state action and that it "at most . . . shows that [the two] were working in accordance with [a] contract." *Id.* at 515. Moreover, because the contract specifically put the bus company in charge of personnel decisions, the court held that the plaintiffs could not show that the school district was entwined *specifically* with the bus company's failure to train or supervise. *Id.*

Though at first glance, Trinity's argument appears persuasive, *In re M.S.* is both doctrinally problematic and factually distinguishable. For one thing, the panel appears to have conflated the nexus and entwinement standards with the state compulsion standard. *See* 756 F. App'x at 514 (insisting that the plaintiffs "show that the state 'played a role in the decision' made by the private actor that led to the deprivation" (quoting *Wolotsky*, 960 F.2d at 1336)). It also seems to have misapplied

17

the entwinement test by framing the inquiry as issue-specific entwinement, rather than general entwinement. *See Brentwood Acad.*, 531 U.S. at 298; *Evans v. Newton*, 382 U.S. 296, 299 (1966) (explaining that a private entity may be treated as a state actor where it is "entwined with governmental policies" or where the government is "entwined in [its] management or control"). Finally, unlike the plaintiffs in *In re M.S.*, this Plaintiff alleges more than just a failure to train.

The Amended Complaint charges Trinity with transporting special-needs students without knowledge of their IEPs, using inappropriate vehicles to transport special-needs students, and, through its employee, effectuating the alleged DPSCD policy pursuant to which Johnson was kept on board. (Am. Compl. ¶¶ 42, 88). These each appear to be areas in which DPSCD was "entwined in [Trinity's] management or control." *Brentwood*, 531 U.S. at 296. Indeed, the contract goes so far as to put DPSCD in charge of "day-to-day operation[s]." (ECF No. 53-1, PageID.1624, 27). This goes beyond the sort of "mere cooperation" often found insufficient to constitute entwinement. *Marie*, 771 F.3d at 364; *see In re M.S.*, 756 F. App'x at 515 (noting the absence of "allegations that the District was involved in the [bus company's] day-to-day management"); *cf. Santiago*, 655 F.3d at 71 ("There is nothing in the record to indicate that this retained responsibility caused the [state] to insinuate itself into the day-to-day operations of the bus company."). Accordingly, Plaintiff has plausibly alleged that DPSCD was entwined in Trinity's day-to-day

activities such that Trinity's conduct can be fairly attributed to the state. Additionally, because Plaintiff has plausibly alleged that MacAlpine prevented Johnson from disembarking pursuant to an official policy, *see supra* Section I.A, the Court also finds that Plaintiff has stated a claim that MacAlpine's conduct, and therefore Trinity's, was compelled by the state.[6]

## CONCLUSION

Plaintiff has successfully pleaded a *Monell* claim under an official policy theory. Because Plaintiff makes no allegations of prior incidents of misconduct, however, her remaining *Monell* theories fail as a matter of law. In addition, regardless of whether viewed through the lens of state compulsion or entwinement, Plaintiff has plausibly alleged a sufficiently close nexus between DPSCD and Trinity's conduct such that Trinity's conduct can be fairly attributed to the state.

---

[6] Although the Court finds that Plaintiff has properly alleged entwinement and state compulsion, it must also issue Plaintiff's counsel a warning. In multiple instances, Plaintiff's briefs cited to paragraphs of the Amended Complaint for facts not alleged therein. For example, Plaintiff's Response to Trinity's Motion [63] claimed that "MacAlpine was specifically told by the vice principle [sic] to not let Carl off the bus and to drive ahead and wait," and that afterwards, "MacAlpine told Carl to 'sit back down.'" (ECF No. 63, PageID.1910) (citing Am. Compl. ¶ 39). Plaintiff's Response to DPSCD's Motion [64], meanwhile, makes the same allegation with citation to a different paragraph of the Amended Complaint. (ECF No. 64, PageID.1922) ("[T]he Trinity bus driver, Ms. MacAlpine, was instructed by the Vice Principal to keep the students on the bus, pull the bus forward and remain with the students until 8:00 am.") (citing Am. Compl. ¶ 42). But not a single paragraph of the Amended Complaint references the vice principal nor 8:00 A.M. Elsewhere, Plaintiff alleges that it is each student's "respective teacher" who must escort them off their bus. (*Id.* at 1922) (citing Am. Compl. ¶¶ 38-40). Again, the Amended Complaint does not reach this level of detail. While the Court is generally understanding of mistakes, these inapposite citations cannot help but give the Court pause. At best, they demonstrate carelessness; at worst, they suggest an effort to surreptitiously add details forgotten from the Amended Complaint. In either case, the Court does not rely on these specifics in reaching its decision. Plaintiff's counsel is expected to take greater care to be candid moving forward. *See* MICH. R. PROF'L CONDUCT 3.1.

Accordingly,

**IT IS ORDERED** that Defendants' Motions to Dismiss [52, 53] are **DENIED**.

**SO ORDERED.**

Dated: May 27, 2021

s/Arthur J. Tarnow
Arthur J. Tarnow
Senior United States District Judge